IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| AISHA RASHIDATU KING, | ) |
|  | ) |
|  | ) |
|     Petitioner, | ) |
|  | )Criminal Action No. 1:12-cr-00180 |
| v. | ) |
|  | )Civil Action No. 1:15-cv-00812 |
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|     Respondent. | ) |
|  | ) |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255.

## I. STATEMENT OF FACTS

Irvine Johnston King and Petitioner (collectively, "the Kings") owned and operated Bright Beginnings Healthcare Services, Inc. ("Bright Beginnings"), a home health care business located in Woodbridge, Virginia. Bright Beginnings provided nurses and nursing aides to approximately twenty-five Medicaid patients and a few patients covered by private health insurance. Apart from the Kings, generally no more than three part-time employees worked for the company at a given time, providing patient care and staffing the office.

1

The company was to submit claims to Medicaid and other insurers stating the number of hours it provided patient services, along with other information, including the dates and modes of service. Bright Beginnings was required to complete and maintain documentation including records signed by the nurse or aide who rendered a given service, along with the patient (or patient's family member) who confirmed the records' accuracy. Instead, Bright Beginnings repeatedly submitted inflated claims for services that were never provided.

In May 2009, an outside firm retained by Virginia Medicaid audited Bright Beginnings. The audit included a multi-day visit to Bright Beginnings' office to review patient files for documentation supporting the claims. During the on-site visit, three auditors reviewed 501 pages of nursing documentation for a total of six Bright Beginnings patients. After matching those six patients' Medicaid claims with the supporting documentation that Bright Beginnings provided the auditors during the onsite visit, the auditing firm made a preliminary report regarding apparent discrepancies. The firm gave Bright Beginnings an opportunity to submit additional records. Bright Beginnings submitted an additional 114 pages of documents to substantiate the Medicaid claims submitted for the six patients. The records appeared fabricated: the supplemental records contained signature blocks bearing identical photocopied signatures from patients

2

and their family members.

The auditors notified Bright Beginnings that the audit revealed that Medicaid had overpaid Bright Beginnings by approximately $435,000 for services related to the six patients at issue. The notice advised Bright Beginnings that it could appeal the finding. Mr. King, on behalf of Bright Beginnings, informed the auditors that the company wished to appeal the finding. Mrs. King took part in the in-person meeting regarding the audit appeal.

In April 2010, 11 months after the initial visit, Bright Beginnings provided the auditors an additional 1907 pages of documents—nearly four times what was initially provided to the auditors. This additional production included records that also bore indicia of fraud: repetitive summaries of nurses' observations of patients for different visits on different days, supposedly written by different nurses; nursing documentation intended to back up the summary forms collected during the on-site visit that included start and end times that did not correspond with those summary forms; time sheets reflecting 16 hours of daily patient services supposedly provided by Mrs. King herself; and signature blocks bearing the identical photocopied signature of patients or their family members.

Bright Beginnings employee Violet Kincaid ("Kincaid"), who was asked to help organize documents to be tendered to the

3

auditors during the appeal process, made similar observations. The documents she compiled had patient notes in the same handwriting but were signed by different nurses. Some of the nurses' signatures were misspelled. Patients' vital signs were the same day after day, shift after shift. Patient family members' signatures were cut from one document and taped onto others, then photocopied. Dates on records documenting visits had been redacted with white out. Records reflecting criminal background checks for nurses included earlier dates taped over later dates on which the reports had actually been run so that the date of the reports matched the nurses' hiring dates, an important consideration when seeking reimbursement for claims related to services performed by those nurses. Kincaid observed hundreds of pages of documents that included these irregularities.

During a search of Bright Beginnings, the Government discovered an array of physically manipulated records, including documents with notations in ink while signatures were photocopied, photocopied signatures taped over signature lines, whited-out signatures and dates on signature lines, whited-out headers and footers, and sections that had been cut out. In addition, records of patient care supposedly performed by three nurses who never worked at Bright Beginnings were found during the search and provided to the auditors.

4

Nadia Kanu, a nurse and friend familiar with Mrs. King's handwriting, identified signatures appearing to be those of Amanda Drah as Mrs. King's handwriting. In Mr. King's presence, Mrs. King frequently forged the signature of nurse Isha Marah ("Marah") on records relating to services Marah never provided. Mrs. King also populated patient notes with records bearing nurse Hannah Kanu's forged signature. In addition, Mrs. King, again in Mr. King's presence, forged the signature of a patient's mother by holding forms to a window and then tracing the signature onto those forms. Records tendered during the audit appeal and collected during the search revealed other nursing documentation in support of claims for services supposedly provided by nurses who never worked for the patients at issue. Kincaid performed the Medicaid billing for Bright Beginnings for approximately two weeks in October 2009, after which time Mr. King took over that task. The claims were submitted electronically.

Once Mr. King took over the billing, Kincaid, and later administrative assistant Tiffany Ferguson ("Ferguson"), used the nurses' documentation to create weekly summaries of the hours each nurse had worked. Kincaid and Ferguson provided those summaries to Mr. King. Although the hours reflected in their summaries matched the original records, they were inconsistent with the hours Bright Beginnings submitted to Medicaid for the corresponding patients and time periods. Mrs. King provided

handwritten patient notes written in her own handwriting and asked Ferguson to transcribe them onto nursing records. Nurse Nadia Kanu also provided Mrs. King with patient notes that Kanu had transcribed onto otherwise blank nursing documentation lacking patient names.

In addition, in late 2009, during the period of time between the auditors' initial on-site visit and Bright Beginnings' submission of additional documents in connection with its audit appeal, both Mr. King and Mrs. King presented a stack of blank nurse's time sheets to a patient's father and asked him to sign them. The records were completed thereafter, including the names of nurses, two of whom never provided any services to that particular patient and one of whom never worked at Bright Beginnings at all.

As part of the fraud, Bright Beginnings billed Medicaid for home health services that the Kings knew had not been provided to patients during times when those patients were in the hospital and therefore receiving nursing care from the hospital staff, when the historic snowstorms of the winter of 2009-2010 prevented nurses from traveling to patients' homes, when the patient was traveling outside the country, and when the patient had discontinued his relationship with Bright Beginnings.

Mrs. King hired one individual, Nenneh Blell ("Blell"), to provide licensed practical nurse ("LPN") services despite knowing

that she was not an LPN and directed her to work under someone else's name. Mr. King also knew Blell was not an LPN and that she was working for Bright Beginnings under a false name. Mrs. King instructed Blell to persuade a patient's mother to lie to Medicaid by stating that Bright Beginnings provided certain services that it did not provide, and that a registered nurse had performed the required monthly visits when in fact the nurse had not. To induce Blell to follow her instructions, Mrs. King, in Mr. King's presence, informed her that if the Kings went down, they would take Blell with them. Similarly, Mr. King later informed Blell that she must persuade the patient's mother to comply, and that if he and Mrs. King went to jail, Blell would also go to jail.

## II.   PROCEDURAL HISTORY

This case was originally prosecuted by the Office of the Attorney General for the Commonwealth of Virginia and was subsequently charged federally. Petitioner was indicted by a Virginia grand jury on September 6, 2011, for felony forgery in violation of Virginia State Code § 18.2-172. Mr. King was also indicted by a Virginia grand jury on September 6, 2011, for felony false statement for payment in violation of Virginia State Code § 32.1-314. If the parties resolved the issue globally, Mr. King would be subject to federal charges. Mr. King's counsel, John Iweanoge, was in contact with Assistant Attorney General

Steven Grist (AAG Grist) regarding a plea offer no later than December 1, 2011. On December 1, 2011, AAG Grist emailed what he termed a slightly modified plea offer from the Commonwealth of Virginia to John Iweanoge for Mr. King, which included references to a federal offer as well as a misdemeanor plea for Petitioner. Mr. Iweanoge acknowledged receipt of the Commonwealth's plea offer on December 1, 2011. On March 5, 2012, AAG Grist again forwarded his original email to Mr. Iweanoge, including notes on which terms changed, as well as references to the "Federal Statement of Facts" and "Federal Plea Agreement." Further, AAG Grist indicated that Assistant United States Attorney Tim Belevetz (AUSA Belevetz) would be the appropriate contact for the federal plea offer. AAG Grist also indicated that the plea offer to Aisha King had been withdrawn. Mr. Iweanoge responded on March 5, 2012, indicating that he spoke with Petitioner and that Mr. King wanted to take advantage of the original plea offer, which included terms for Mrs. King. He further indicated that the terms would be acceptable to Mr. King but that they were held up by how Petitioner's case would be handled. It appears that the Commonwealth did not elect to reopen its initial global plea offer. Federal discussions progressed. It further appears that this is the plea offer that the Kings intend to reference when they indicate: "[t]he Commonwealth offered a favorable plea deal involving a misdemeanor conviction and no prison sentence for

8

Mrs. King, and a felony conviction with a reduced sentencing loss for Mr. King. But the Commonwealth withdrew its offer before the Kings could act upon it."

Around the same time, Mrs. King's attorney for the state matter, Abu Kolokoh, was negotiating with AAG Grist and AUSA Belevetz. On March 23, 2012, AAG Grist sent Mr. Kolokoh a plea offer for Mrs. King. AAG Grist set out specifics for the federal plea. Petitioner forwarded the plea offer from her attorney to Mr. Iweanoge, her husband's attorney, on March 27, 2012. On April 18, 2012, Mr. Kalokoh emailed AUSA Belevetz indicating that Mrs. King "has not made a decision" and that he would need to speak with Mr. King's attorney before communicating whether they would accept the plea. He indicated he would provide a final answer by April 24, 2012.

On April 19, 2012, AUSA Tim Belevetz sent a letter to John Iweanoge in reference to a plea offer for Mr. King "that [they] began discussing in December 2011." The letter indicated that the offer would expire on April 26, 2012, at noon. On April 19, 2012, Mr. Belevetz sent a letter to Mr. Kalokoh for Mrs. King with substantially the same content as the plea offer letter he sent to Mr. King. Both Kings subsequently received an extension of the plea offer until May 25, 2012.

On April 25, 2012, Mr. Pritchard sent the Petitioner the following email:

As I mentioned on the phone, the US Attorney was not willing to move tomorrow's noon deadline for the plea offer. He says all of the relevant information was given to Mr. Kalokoh months ago and they want to move forward with the case. Here is the latest with respect to the plea:

The general parameters for the plea offer (set forth in the April 19th letter) remain the same. This means if you plead guilty you will have a total offense level of 21, with a sentencing range of 37-46 months. Today, Mr. Belevetz agreed that they would not prosecute you for any other possible charges and he also would not object to us arguing for a sentence below the guideline range. In other words, the government will argue for a sentence within the 37- 46 month range; however we are free to argue that the sentence should be lower than that. Ultimately the decision lies with the judge.

Mr. Belevetz also agreed to keep the loss amount open if we agree to the plea by noon tomorrow. With this concession, the loss value would not exceed its current level $400,000-$999,999; however it may come down if the government can not show us sufficient proof of the actual damages. As we discussed, the loss value plays a large part in the sentencing guidelines and a reduction in the loss value would result in a lower total offense level (meaning a lower recommended sentencing range).

There are no guarantees that the loss value will come down, or that the judge will impose a sentence below the guidelines, but this is a more favorable offer than was originally proposed.

If you do not accept the plea offer, the government will include a charge of aggravated identity theft which will add an additional 2 years to any sentence you receive if you are convicted.

One additional issue that I want to bring to your attention and we will need to discuss in more detail tonight. At our initial meeting you informed me that you have a green card. As a lawful permanent resident, you would be subject to removal/deportation from the United States if you are found guilty of an aggravated felony. An aggravated felony includes a theft offense

> if the term of imprisonment exceeds 1 year and a crime
> involving fraud or deceit if the loss to the victim
> exceeds $10,000. This includes an attempt or conspiracy
> to commit these charges. Again, I want to discuss this
> with you more tonight, but it appears that a conviction
> for conspiracy to commit health care fraud (or for any
> of the other charges likely to be filed) may result in
> your removal/deportation at the end of your sentence.
>
> Please call me at your earliest convenience tonight, my
> cell number is xxx-xxx-xxxx.

Ex. 7 at 1.

On May 18, 2012, Mr. Belevetz sent an email to Mr.
Pritchard indicating that if Mrs. King did not enter a plea by
the end of the following week (Friday, May 25, 2012), he would
assume she did not wish to enter a pre-indictment plea and he
would seek an indictment. On May 24, 2012, Mr. Pritchard emailed
Petitioner the following:

> I just spoke with Irvine's attorney about many of
> the same issues we have been discussing for the last
> couple of weeks. He indicated that he was calling both
> of you now, so even though we have discussed all of
> this before, I am emailing to make sure you
> understand that the deadline to accept the plea
> offer is tomorrow. If you do not accept the plea
> offer tomorrow, the government is going to seek an
> indictment which will include aggravated identity
> theft which includes an additional mandatory 2 year
> sentence.
>
> When we spoke earlier today you indicated there was
> a family emergency, and I hope that everything is ok,
> but the government is not going to extend the deadline
> beyond tomorrow. There are some benefits to accepting
> the plea -you avoid the 2 year term on the identity
> theft charge; we can stagger sentencing sentencing
> with Irvine so that the kids are taken care of; we can
> still argue the loss amount; and you will get credit
> for accepting responsibility for the offenses.

So far the major sticking point seems to be the loss amount; however you seemed reluctant to accept a plea even if we got the loss amount drastically reduced. This may be because of the immigration/removal issues that arise out of a conviction for this offense or some other reason. Unfortunately, the government is not willing to amend the charge to something that would allow you to avoid removal. They have agreed to remove the language from the plea agreement where you would have waived appeal rights on the removal and agreed to an expedited removal; however they will not amend the charge.

I have attached the most current version of the plea agreement and statement of facts. If you are considering a plea, I strongly advise you to take the plea tomorrow. I am not trying to force you into taking a plea, I am simply saying that the plea offer will only get worse after tomorrow. If we are going to prepare for trial, you need to start providing me with documents and other evidence to prepare the defense. I still haven't received any of the electronic records you mentioned.

Please call or email if you have any questions. Thank you.

Ex. 7 at 1-2. On May 25, 2012, at 8:20 am, Mr. Pritchard indicated, "I don't have a definite answer yet from Ms. King. I will let you know her position on the plea as soon as possible. Thanks." Thirty minutes later, Mr. Belevetz communicated that unless she entered a plea that day, the plea offer would expire and become one count conspiracy and one count aggravated identity theft.

On June 28, 2012, the grand jury indicted the Kings, charging them with one count of conspiracy to commit health care fraud and two counts of aggravated identity theft in

violation of 18 U.S.C. § 1028(A) along with 22 and 13 counts, respectively, of health care fraud in violation of 18 U.S.C. § 1347. On July 27, 2012, after Michael Pritchard filed a motion to withdraw as counsel, Aisha King appeared with new retained counsel, Michael Khouri, *pro hac vice* through John Iweanoge.

On January 7, 2013, a jury trial commenced. The Government called twenty-two witnesses and defense counsel cross-examined each. On January 9, 2013, the Government rested, parties delivered closing arguments, and the District Court charged the jury. On January 10, 2013, the jury found the Kings guilty on all counts.

On March 22, 2013, the District Court sentenced each defendant to a term of imprisonment of 121 months—97 months for the conspiracy and health care fraud counts, the low end of the sentencing guidelines range, and a mandatory, consecutive 24 months for the two aggravated identity theft counts-followed by three years of supervised release. The Court also ordered the Kings jointly and severally to pay restitution in the amount of $931,894.16. The Court entered consent orders of forfeiture in the same amount. Following two consent motions to continue the reporting date, the Court ordered the Kings to report to the Bureau of Prisons on August 14, 2013.

On March 28, 2013, the Kings each filed notice of appeal. The Kings' current counsel represented them on appeal. The Kings

13

argued "that the district court erred in responding orally to the jury's request for a written copy of the jury instructions pertaining to the statutory elements of the Kings' offenses." On December 6, 2013, the Fourth Circuit Court of Appeals affirmed this Court's judgment. The mandate took effect on December 30, 2013. On March 11, 2014, the Kings filed a writ of certiorari before the Supreme Court of the United States. The writ of certiorari was denied on June 30, 2014.

Petitioner filed the instant Motion to Vacate under 28 U.S.C. § 2255 on June 24, 2015. On June 29, 2015, Petitioner filed her amended Motion to Vacate. On October 2, 2015, this Court ordered the Government to respond. On October 23, 2015, the Government moved this Court to compel affidavits from the Kings' former counsel. On November 3, 2015, this Court ordered the Kings' former counsel to file an affidavit. Also on November 3, 2015, Petitioner filed a motion to modify the order, which the Government opposed on November 13, 2015. The Court denied the motion to modify on November 16, 2015, and the Government was granted an extension to file its response on December 23, 2015. The Government did so.

## III.  STANDARD OF REVIEW

A petitioner attacking his conviction or sentence pursuant to 28 U.S.C. § 2255 bears the burden of proving that at least one of four grounds justify relief: (1) "that the sentence was

imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" or (4) that the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2008). The catch-all fourth category of non-jurisdictional, non-constitutional errors are cognizable under § 2255 only where the alleged error presents either "a fundamental defect which inherently results in a complete miscarriage of justice," "an omission inconsistent with the rudimentary demands of fair procedure," or other "exceptional circumstances" that make the need for remedy apparent. See Hill v. United States, 368 U.S. 424, 428 (1962).

A motion pursuant to § 2255 "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982) (internal citation omitted); see also Dragonice v. Ridge, 389 F.3d 92, 98 (4th Cir. 2004) (citing Frady, 456 U.S. at 164–65). Errors that should have been raised at trial or on direct appeal, but were not, are procedurally defaulted. Frady, 456 U.S. at 167–68.

There are three exceptions to the well-established procedural default rule. First, procedural default will not act as a bar to collateral relief where a petitioner demonstrates cause for the procedural default and actual prejudice therefrom.

15

Frady, 456 U.S. at 167. Such an error must work to the "actual and substantial disadvantage" of the petitioner—not merely create a possibility of prejudice. Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting Frady, 456 U.S. at 170. Second, procedural default will not act as a bar where a petitioner can demonstrate actual innocence in either a capital case or a case in which a recidivist sentencing enhancement was applied. United States v. Mikalajunas, 186 F.3d 490, 494-95 (4th Cir. 1999). Third, procedural default will not act as a bar where a petitioner brings a claim of constitutionally ineffective assistance of counsel. United States v. DeFusco, 949 F.2d 114, 120-21 (4th Cir. 1991).

In Strickland v. Washington, the U.S. Supreme Court held that the Sixth Amendment right to counsel includes the right to the effective assistance of counsel. 466 U.S. 668, 686 (1984). To establish a claim for ineffective assistance of counsel, a defendant must prove both that his counsel's conduct fell below an objective standard of reasonableness and that the deficient performance caused the defendant actual prejudice. Id. at 687-88, 691-92. "The defendant bears the burden of proof as to both prongs of the [Strickland] standard." United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).

Under Strickland, "a court must indulge a strong presumption that counsel's conduct falls within the wide range

16

of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689. The Strickland standard is highly deferential to counsel. Id. at 686, 689, 690. The evaluation of a defense counsel's performance is made from his or her perspective at the time of the alleged error and in the light of all circumstances. Id. at 690.

To satisfy the second prong of the Strickland test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In other words, a defendant must affirmatively prove prejudice that is so serious as to have deprived him of a fair trial, a trial whose result is unreliable. See id. at 693.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700. Because "[t]he defendant bears the burden of proving Strickland prejudice," if a defendant fails to meet this burden, "a reviewing court need not consider the performance prong." Fields v. Attorney General of Maryland, 956 F.2d 1290, 1297 (4th Cir. 1992) (citing

17

<u>Strickland</u>, 466 U.S. at 697).

IV.  **ARGUMENT**

    **A. Petitioner's Motion Fails on the Merits.**

        **1. Petitioner's argument regarding proper subjects of cross examination is without merit.**

Petitioner claims to have received ineffective assistance of counsel because defense counsel did not "cross-examine the Government's witnesses to establish who actually benefitted from overpayments, nor did they emphasize the lack of such evidence in opening or closing statements." Had defense counsel "followed the money," Petitioner argues, the trail would not have led to the Kings; they would have been shown to have insufficient intent to commit the fraud.

Again, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. <u>See</u> <u>Strickland</u> at 689-90; <u>Terry</u>, 366 F.3d at 316-18, <u>cert. denied</u>, 543 U.S. 983 (2004). For a petitioner to overcome this presumption, "the analysis of counsel's performance typically must be comprehensive; i.e., not narrowly limited to a review of counsel's failings." <u>See</u> <u>Strickland</u>, 466 U.S. at 689. The Supreme Court cautioned that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." <u>Id.</u> The Court noted particularly that the reasonableness of counsel's actions often depends on "informed strategic choices made by the defendant and on information

supplied by the defendant." Id. at 691.

Here, Petitioner does not offer any exhibits or other evidence in support of this argument. The record makes clear that the trail of fraudulent money leads directly to the Kings, and that they benefited from the fraud. The Kings jointly owned Bright Beginnings, which received payment from Virginia Medicaid when claims (fraudulent or otherwise) were submitted. As set forth in the forfeiture order, the amount paid by Virginia Medicaid for the claims submitted by Bright Beginnings was $766,620.43. Bright Beginnings received an additional $165,273.73 for claims submitted to and paid by Blue Cross Blue Shield, for a total of $931,894.16.

In making the argument that the Kings received ineffective assistance of counsel for failure to cross-examine witnesses with respect to who benefited from the fraud, the Kings actually highlight an example that contradicts their position. The Kings allege that defense counsel should have focused on whether the nurses benefitted from their overbilled hours, citing the cross examination of FBI Agent Vanderbunt. Mr. Iweanoge cross examined Agent Vanderbunt with respect to a summary spreadsheet she created, repeatedly asking whether she considered or included payroll records on the spreadsheet. The Kings now suggest that the nurses also benefitted from the fraud because they were paid for more hours than they worked.

19

Notably, both Mr. Iweanoge and Mr. Khouri repeatedly and artfully suggested through cross examination and in closing that others were responsible for and/or benefiting from the fraud. Defense counsel did exactly what they are now accused of not doing.

The Kings next allege that trial counsel did not make explicit or sufficiently develop the inference that others benefited from the fraud, thus providing ineffective assistance. This point does not rise to the level of ineffective assistance. Courts are most deferential to the strategic decisions made by defense counsel during trial. See, e.g., United States v. Strickland, 466 U.S. at 689; see also United States v. Dyess, 730 F.3d 354, 364 (4th Cir. 2013) ("[W]e give counsel wide latitude in determining which witnesses to call as part of their trial strategy"); United States v. Roane, 378 F.3d 382, 400 (4th Cir. 2004) (conclusory claims about hypothetical witnesses provide no grounds for relief); Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) ("Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what evidence they can choose not to introduce.")(internal citation omitted).

The evidence presented at trial demonstrates that the Kings were benefactors of the fraud. As sole owners of Bright

Beginnings, the Kings received Medicaid payments made to the business. To the extent that insurance payments were not sufficient to make the business profitable, or payments had to be returned to the Medicaid program, the Kings would suffer loss. Any greater focus on who benefited from the fraud would have likely worked against the Kings. See Tucker v. Catoe, 221 F.3d 600, 614-15 (4th Cir. 2000) (counsel is not ineffective for failing to make an argument where there is "no reasonable probability that [it] would have been successful."). As the Government stated in closing,

> "There were also office employees, people like Violet Kincaid, Jody Allen, and Tiffany Ferguson, who performed administrative functions within the office. They weren't the owners. They weren't the ones who had any motive to inflate Bright Beginnings' Medicaid claims. They were the ones who simply received paychecks. But the Kings had a motive, especially when making payroll was tough, and the more they overbilled Medicaid, the more money they put in their pockets."

> "They ran the company. When it came to the business' profits, they were the ones who benefited. When it came to not paying Medicaid back as a result of the audit, they were the ones on the hook for any money owed."

Both Mr. Khouri and Mr. Iweanoge indicate that they believed this strategy would have been to their clients' detriment. Emphasizing where the money went would have emphasized their clients' motive to commit the fraud.

Defense counsel thoroughly cross examined each of the

21

Government's twenty-two witnesses. Mr. Iweanoge and Mr. Khouri worked in tandem using cross examination effectively to undermine witness credibility, highlight inconsistencies between witnesses' attempt to blame employees, and suggest that the billing was in error due to disorganization rather than deliberate fraud, demonstrate how confusing and complicated billing and documentation could be, and more. In doing so, they demonstrated familiarity with documents, witnesses, and a complex regulatory scheme. Petitioner's allegations that trial counsel should have focused elsewhere are without merit. There is no showing (or likelihood, based on the record) that the strategy they now promote would have had a reasonable probability of a better outcome at trial.

### 2. **Petitioner received effective assistance of counsel during plea negotiations.**

Petitioner alleges that she and Mr. King were provided constitutionally deficient assistance of counsel at the plea stage based on the following purported failures: "(a) failing to adequately apprise [the Kings] of the apparent strength of the prosecution's case, (b) failing to adequately inform them of the sentence they would likely face if found guilty of the charges against them, and (c) only belatedly informing the Kings of the terms of the Government's offer." Each of these arguments is without merit.

The Government offered the Kings several plea offers. Each

was rejected. The Kings never allege that their counsel failed to inform them of the plea offers, advised them to go to trial rather than accepting any of the plea offers, or miscalculated or misrepresented their probability of a favorable outcome at trial. Each of the three defense counsel the Kings engaged to assist them in this matter indicate in their affidavits that they advised the Kings to accept each of the pleas being offered, but ultimately (and properly) left the decision to the Kings.

The Kings cannot allege ineffective assistance of counsel during plea negotiations where the undisputed evidence is that the Kings were offered favorable pleas, their counsel informed them of those pleas and advised them to accept those favorable pleas, and their counsel did not overstate their chances of success at trial. There is nothing in the record to suggest that the Kings would have made a different decision as to the various pleas offered to them, and nothing to indicate the "reasonable probability" necessary to clear the hurdle posed by Strickland's prejudice prong. The Kings were advised to accept several plea offers. They rejected each one against their counsels' advice. That they now regret their decision is insufficient grounds for relief.

**A. Petitioner received effective assistance of counsel where it is undisputed that Petitioner was advised to accept a favorable plea offer based on counsel's assessment of the evidence.**

The Kings first allege that their counsel did not review the

evidence against them in advising them as to the wisdom of accepting the plea offer. This allegation, supported only by a conclusory statement to that effect in each of the Kings' affidavits, is baseless and factually inaccurate. Although Petitioner does not specify which of her counsel she believed had not adequately reviewed the evidence so as to be able to advise her effectively as to a plea, both Mr. Pritchard and Mr. Khouri reviewed the evidence and advised Petitioner to plead guilty. Mr. Pritchard indicated that he had reviewed documents he received from Mr. Iweanoge and the U.S. Attorney's Office, including DMAS-90 forms, nurse notes and other documents. Mr. Khouri indicated that he visited the FBI field office on two occasions to review the evidence. Mr. Khouri received various discovery materials from the Government electronically shortly after he was retained. Mr. Iweanoge had also reviewed the evidence and had two investigators involved in the case. The Kings' counsel did investigate the matter and review the evidence in their case.

However, the Court need not make a factual determination about how much evidence counsel reviewed and whether that was sufficient. It is undisputed that the Kings' counsel advised them, based on however much or little evidence they had examined, to accept a favorable plea offer rather than go to trial. The Kings offer in support that ABA Standards state "[d]efense

24

counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed" and that "counsel must avoid overconfident assurances to clients." Notably, the Kings do not allege that their counsel advised them that the evidence against them was sparse or that they had a good chance (or any chance) of overcoming the Government's evidence at trial. Thus, it is undisputed that the Kings were advised to accept the plea because the evidence against them was strong. To allege prejudice, the Kings would need to show that but for the ineffective assistance they allege, there would have been a reasonable probability of a different outcome. Where the Kings do not allege that they were advised to go to trial by any counsel at any point in the plea negotiation or litigation of this case, they cannot demonstrate the probability of a different outcome.

In support of their ineffective assistance claim as to plea negotiations, the Kings also allege that they apprised their lawyers of witnesses to interview, and that their counsel did not do so. To the extent the Kings assert that their counsel did not adequately review the evidence so as to effectively advise them as to the strength of the case against them, as discussed above, the Kings cannot show any prejudice from this alleged failure. To the extent the Kings intend to support a claim that the Kings did not receive adequate assistance at trial, the claim is

meritless. The Kings each allege in their affidavits that these individuals were "principally former employees" of Bright Beginnings. The Kings do not provide names of any other individuals about whom they told their lawyers or what evidence those individuals might have offered on their behalf at trial. The Kings specifically name only Kadiatu Richardson, who "could testify that a star Government witness, Nenneh Blell, had lied [to the Kings] that she was actually Ramatou Fofana, a licensed nurse." The Kings appear to allege that as a result, their trial counsel missed the opportunity to impeach Nenneh Blell and did not use the information they provided. Both defense counsel extensively cross-examined and impeached Nenneh Blell. Mr. Iweanoge used the information received from Kadiatu Richardson during his extensive cross of Blell. That trial counsel did not call a specific witness to provide additional impeachment of Blell is a matter of trial strategy. See United States v. Roane, 378 F.3d 382, 400 (4th Cir. 2004) (conclusory claims about hypothetical witnesses provide no grounds for relief). The Kings' allegations as to their lawyers' failure to interview or call witnesses on their behalf are conclusory and without merit.

### B. Petitioner was advised of the comparative merit of accepting a plea offer and decided to proceed to trial.

The Kings allege that during plea negotiations, because their attorneys did not inform them of the sentence they would

likely face if they went to trial, they were unable to consider the plea agreement's comparative merit. The plea negotiations the Kings appear to be referencing all took place before a complaint or indictment was filed in this case. Each of the three defense counsel affirms that they informed the Kings of the favorable nature of the plea agreement(s). At the time the plea offers at issue here were extended, counsel could not have definitively stated what charged the Kings might face if the Government indicted—for example, how many substantive health care fraud counts might be included, or how many counts of aggravated identity theft. They could, however, have given the Kings a good sense of how advantageous a plea agreement would be compared to what they could be exposed to at trial—and they did so.

Petitioner alleges that she did not know that they would lose the Government's support for staggered sentencing if they did not accept the plea offer. The Kings appear to be offering this perspective to demonstrate that they received ineffective assistance during plea negotiations and were not fully aware of how favorable the terms could be. Mr. Pritchard negotiated for staggered sentencing, which was not initially part of the Government's plea offer. Mr. Pritchard also expressly pointed out via email to Petitioner that this was a benefit of the plea, and that "the plea offer will only get worse."

In the email Mrs. King forwarded to Mr. Iweanoge on March

27

27, 2012, AAG Grist referenced the Government's intent to indict on additional counts and charges if the plea offer was not accepted, and specifically emphasized the two-year mandatory sentence for aggravated identity theft. Mr. Pritchard specifically informed his client of the offense level (21, with a sentencing range of 37-46 months) and the possibility of a reduction in the loss amount. Mr. Pritchard also specifically highlighted for his client: "[i]f you do not accept the plea offer, the government will include a charge of aggravated identity theft which will add an additional 2 years to any sentence you receive if you are convicted." He reminded his client, "[i]f you do not accept the plea offer tomorrow, the government is going to seek an indictment which will include aggravated identity theft which includes an additional mandatory 2 year sentence."

Mr. Khouri specifically recalls discussing the guidelines range with Petitioner, and specifically recalls explaining how an added charge for identity theft would add consecutive time. Mr. Khouri also recalls discussing with Petitioner the added value of pleading guilty even to the same charges for which she would go to trial, since she would receive some benefit from accepting responsibility.

      **C. While the Kings allege that their counsel only belatedly informed them of the terms of the Government's plea offer, they offer neither**

**specifics nor meritorious allegations that constitute grounds for a claim of ineffective assistance.**

Petitioner indicates that her counsel (presumably Mr. Pritchard or Mr. Khouri, though she does not specify), was "slow" in apprising her of the details of the Government's plea offer. It is not clear what Petitioner considers "slow," or how long she believes or knows Mr. Pritchard or Mr. Khouri (or even Mr. Kalokoh) was aware of the details of the offer before notifying Petitioner. Petitioner further alleges that her counsel was "slow" in notifying her that her time for considering the plea offer was drawing to a close, and says she only had minutes to make a decision. Petitioner does not offer any details about how long she knew the plea offer was outstanding or how long she had to consider it before she was required to make a decision. The evidence indicates that a plea offer for Petitioner was pending when Mr. Pritchard was retained and that he managed to have the offer extended for an additional 30 days. Further, it is unclear which of the many plea negotiation discussions the Kings are referencing when they claim that Iweanoge required them to provide an answer "that day." The Kings were extended a plea offer at the state level, after which time they were extended a plea offer at the federal level. Petitioner was offered a plea wherein her total offense level was 21, which corresponded to a guideline range of 37-46 months.

Petitioner's counsel managed to negotiate a more favorable plea offer than what the Government initially offered, and Petitioner was given ample time and advised as to the comparative advantage of accepting that plea. When that plea offer expired, the Government made clear that a less favorable (but still advantageous) plea offer was available—a plea to conspiracy as previously offered, with the addition of 24 months imprisonment for one count aggravated identity theft.  Counsel discussed each of the plea offers with their respective clients, as corroborated by the affidavits provided by each of the three attorneys for the Kings during the pendency of the federal case. Petitioner had several opportunities to accept a plea. Her failure to accept any of them is conclusive evidence that, despite her thoughts in hindsight, she would not have accepted a guilty plea.

## V. CONCLUSION

Petitioner fails to make the requisite showing of either deficient performance or sufficient prejudice to support a claim of ineffective assistance of counsel. An evidentiary hearing is unnecessary. Accordingly, this Court must deny Petitioner's motion as substantively and procedurally barred.

An appropriate order shall issue.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 12, 2016